NOTICE

Decision filed 01/30/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250867

NOS. 5-25-0867, 5-25-0868 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | Nos. 25-CF-208, 25-CF-251 |
| | ) | |
| DMARCUS I. CRAIG, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOIE delivered the judgment of the court, with opinion.
Justices Barberis and McHaney concurred in the judgment and opinion.

**OPINION**

¶ 1 The Jefferson County trial court entered an order in two related cases, Nos. 25-CF-208 and 25-CF-251, denying the defendant, Dmarcus I. Craig, pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2024)), as amended by Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act. See Pub. Act 102-1104, § 70 (eff. Jan 1, 2023) (amending various provisions of the Pretrial Fairness Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (setting the Pretrial Fairness Act's effective date as September 18, 2023). We consolidated these cases on appeal *sua sponte*, for decision only. In both cases, the defendant argues that the State failed to show that he posed a threat, that he was a willful-flight risk, or that there were no conditions or combination of conditions that could mitigate the threat he posed to the community. For the following reasons, we affirm in part and vacate in part.

1

¶ 2                                    I. BACKGROUND

¶ 3      The underlying criminal cases stem from separate incidents that took place in the latter half

of 2025. The first incident occurred on August 2, 2025, in which the defendant was alleged to have

broken into the home of Dennis Lemons and stolen a firearm from the home. On September 15,

2025, the defendant was charged by information with one count of residential burglary in case No.

25-CF-208; he was indicted by a grand jury on September 18, 2025. The second incident took

place on October 17, 2025, when the Mount Vernon police executed a valid arrest warrant against

the defendant during a traffic stop. Incident to the defendant's arrest, police searched his vehicle

and recovered the stolen firearm, as well as 22 grams of individually packaged cocaine, $569 in

cash, scales, Baggies, and other accoutrements indicative of controlled substance delivery. On

October 20, 2025, in case No. 25-CF-251, the defendant was charged by information with one

count of armed violence and one count of unlawful possession of a controlled substance with intent

to distribute; he was subsequently indicted by a grand jury on October 23, 2025. The State filed

petitions to deny the defendant pretrial release in both cases, alleging in both petitions that he was

charged with a qualifying offense and that his release posed a real and present threat to the safety

of any person or persons in the community. The trial court held a joint detention hearing on both

petitions on October 21, 2025.

¶ 4                    A. Hearing on Petitions to Deny Pretrial Release

¶ 5      The State presented its evidence by proffer. As to the burglary charge, the State proffered

that Detective Shaun Hoang would be expected to testify that he interviewed Lemons after the

incident. Lemons told him that, earlier that day, he had answered a knock at his door and saw that

it was a man he knew only as "Petey." The man wore black clothing with white writing on it and

arrived in a maroon or black GMC Acadia SUV. Lemons told Detective Hoang that he knew Petey

2

from a month ago, when Lemons's friend came over to his house for drinks and brought Petey with her. At the time they arrived, Lemons had his handgun on the counter and was cleaning it. Lemons said that he had not seen Petey again until he showed up at Lemons's door on August 2, 2025. After Petey arrived, Lemons informed him that he was leaving to go to his brother's house. Lemons locked his door and left. A short time later, he received a call from a neighbor reporting the incident.

¶ 6    Police obtained security camera footage from a neighbor, which captured the offender's maroon SUV and two suspects leaving Lemons's backyard. Another neighbor, Angela Schwartz, told police that she saw a dark-colored red or maroon SUV—possibly a GMC or Chevy Tahoe— circle her block a couple of times prior to the burglary. She later saw two men exit the vehicle and run toward Lemons's house; she then heard a loud bang and saw that Lemons's door had been kicked in. Schwartz stated she observed the two men run back out of the house, with one cradling something in his arms. She saw them reenter the SUV and drive off. Schwartz described the two men to police and later picked the defendant's photograph out of a lineup as one of the men she had seen.

¶ 7    Detective Hoang also spoke with Samantha Thomas, the friend who brought "Petey" with her to Lemons's house about a month ago. She said she had not known Petey for very long and had not seen him on the day of the burglary. She gave police his address and his Snapchat account, which was under the name "Bonpeewee." Another detective knew the defendant to go by the nickname "Peewee." Lemons later identified the defendant out of a photograph lineup as "Petey."

¶ 8    Lastly, the State proffered that Detective Hoang was able to contact the defendant by telephone on August 25, 2025. The defendant agreed to report to the station for an interview, but he never came. The State then proceeded to present evidence in case No. 25-CF-251.

3

¶ 9 The State proffered that Detective Troy Hails, of the Mount Vernon Police Department, would testify that he was familiar with the defendant and knew that the trial court had issued a warrant for the defendant's arrest for the residential burglary charge. On October 17, 2025, Detective Hails observed the defendant entering a vehicle; he radioed for backup and initiated a traffic stop of the vehicle. Inside the vehicle were the defendant, Samantha Thomas, who was driving, and another passenger, Trey Greenwood. The defendant complied with the stop and told the police that there was "some stuff" in the vehicle, specifically "in the bag." Upon searching the vehicle, the police found the firearm that was stolen from Lemons's residence inside a backpack on the front passenger side, where the defendant had been sitting. The backpack also contained several quantities of individually packaged white powder (which field-tested positive for cocaine), raw cannabis, pills that were suspected to be ecstasy, and "other accoutrements *** indicative of controlled substance delivery," including a scale and large amounts of cash.

¶ 10 Thomas and Greenwood denied any knowledge of what was in the bag. The defendant was advised of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and gave a recorded interview. He claimed he purchased the gun legally but could not provide the name of the seller, written proof of purchase, or any messages related to the purchase. When told that the gun had been reported stolen, the defendant expressed disbelief and said that the seller must have reported it stolen after selling it to him. The defendant admitted that the backpack in the car contained cocaine, ecstasy, and cannabis and said the cocaine was for his personal use. According to the police, the cocaine was packaged in a manner and amounts consistent with distribution. The defendant continued to deny selling cocaine and ecstasy but admitted to selling cannabis.

¶ 11 The State then noted that the defendant was charged with three separate detainable felony offenses, the Class 1 residential burglary in case No. 25-CF-208 and the two Class X felonies of

4

armed violence and unlawful possession of a controlled substance with intent to distribute in case No. 25-CF-251. The State argued that its chance of success at trial was very high. The State noted that Schwartz had identified the defendant from a photograph lineup as one of the two individuals she saw run in and out of Lemons's house. Lemons attributed direct knowledge of the stolen firearm to the man he knew as "Petey," as Petey had seen Lemons cleaning the firearm when Thomas brought him to Lemons's house and Lemons identified the defendant as "Petey" from a photograph lineup. The State further argued that the police then found the defendant in direct possession of the stolen firearm, as well as controlled substances, in a bag that the defendant admitted belonged to him. While the defendant denied selling the drugs, he admitted that the drugs belonged to him. Regarding the armed violence charge, the State argued that it was sufficient to show that the defendant possessed the firearm while also in possession of the drugs.

¶ 12     In addition to the likelihood of success based on the evidence against the defendant and his admissions to much of the conduct with which he had been charged, the State noted the "massive" sentencing exposure that he faced. The sentencing ranges were 4 to 15 years' incarceration for the burglary, a permissively consecutive 15 to 30 years' incarceration for armed violence, and a permissively consecutive 6 to 30 years' incarceration for possession of a controlled substance. The State thus argued that the defendant was a significant flight risk.

¶ 13     The State further asserted that the defendant was a risk to public safety, given his admission to abusing substances and possessing a gun. He was also a specific risk to Lemons, Lemons's property, and Schwartz for having gone on record identifying the defendant. The State argued that Thomas was also forthcoming with law enforcement and could be at risk as well. The State thus argued that the defendant should be denied pretrial release.

¶ 14    The defense argued that the defendant was 24 years old and had resided in Jefferson County for 20 years, which was also where his family resided. He did not, however, have a fixed address and had recently been staying at his mother's house. In the past year, he had been employed but was on workers' compensation due to a back injury. To make ends meet, the defense stated that the defendant was about to start another job and was looking for additional work as well. The defendant was not on probation, bond, pretrial release, or work release when he was arrested. He had never been sentenced to prison and did not have any failures to appear in court. He had received supervision for one misdemeanor for disorderly conduct, but he was not an addict or an alcoholic.

¶ 15    The defendant was also in a lot of pain due to a hernia for which he needed to schedule surgery. This was in addition to the back injury that caused him to be on workers' compensation. Despite his health condition, the defendant stated that he had been employed for three weeks. Defense counsel stated that the defendant would submit to any pretrial release condition the trial court might impose, such as electronic monitoring and home confinement at his mother's home. The defendant also had other available residences where he could be on home confinement, if his mother's house was not acceptable.

¶ 16    The State then pointed out that the pretrial investigation report indicated that, at the time of the burglary, the defendant was on court supervision for a Class C misdemeanor disorderly conduct charge in Jefferson County. The record reflects that the pretrial investigation report referenced by the State also included multiple sections that indicated that the information for those sections was unknown due to safety concerns. In three places the report further states, "Due to safety concerns per jail staff, [the defendant] was not interviewed by OSPS."

¶ 17    The trial court found that there was no condition or combination of pretrial release conditions that would assure that the defendant would not flee the jurisdiction or not present a

6

safety threat. In explaining its decision, the trial court first stated what factors it found in the defendant's favor. He had no felony convictions, he was employed at the time of his arrest, he had ties to the community and family support from his mother and other relatives, and he had never previously failed to appear in court.

¶ 18 However, the trial court noted that the list of factors against him was "pretty lengthy." The charges against him were very serious—Class 1 and Class X felonies—and all three were for detainable offenses. The residential burglary charge carried 4 to 15 years of mandatory prison sentence, without probation, conditional discharge, or periodic imprisonment. The same applied to the two Class X felonies, except their sentencing ranges were 6 to 30 years' incarceration. The trial court added that the armed violence charge had a minimum sentence of 15 years' incarceration. Thus, the trial court found the seriousness of the offenses and the level of possible penalties to both weigh against pretrial release.

¶ 19 Turning next to the strength of the State's case, the trial court found it to be "extremely strong" based on the proffered evidence. The defendant was identified as a suspect in the burglary through video evidence, at least one eyewitness identification, and the victim's identification. Furthermore, the defendant's vehicle was also identified through these means. Regarding the other offenses, the trial court stated that the defendant admitted that the drugs were his, and his assertion that they were for his personal use was not a credible one, particularly because of how the drugs were packaged and because of the other items the police found in the same backpack. The defendant's statement to the police that he purchased the gun also lacked credibility, because he could not procure any documentation or give any details about the sale and because Lemons identified the gun as the one taken from his home.

7

¶ 20    While the trial court recognized that the defendant had relatively few problems with the law and no history of failing to appear, the trial court nonetheless found the defendant to be a flight risk because of the high likelihood that he faced significant prison time, due to the combination of the seriousness of the offenses, the strong evidence against him, and the fact that his charges qualified for permissive consecutive sentencing. Furthermore, the trial court explained that the defendant was found in possession of a firearm and there were known witnesses who identified him as a suspect—and even though there was no evidence of the defendant ever hurting anyone, there was an inherent danger in someone illegally possessing a gun while also dealing drugs. Lastly, the trial court noted that the defendant was asking to be released to his mother's care and that his mother also had pending felony charges before the same court.

¶ 21    The trial court concluded that this was "not really a close case for detention" and thus granted the State's petitions in both cases, denying pretrial release. In its orders in each case, the trial court indicated that its ruling was based on both the willful flight and dangerousness standards. See 725 ILCS 5/110-6.1(a)(1)-(8) (West 2024). In the trial court's written order, regarding dangerousness, the trial court stated that the defendant was privy to multiple individuals who provided incriminating testimony against him and admitted to possessing a firearm and large amounts of narcotics that he was likely selling. The trial court denied release to protect the witnesses, the victim, and the victim's property. Regarding willful flight, the trial court noted the "potential massive sentencing range, coupled with [the] strength of the State's case," as well as the fact that the defendant was already on court supervision during the commission of the offenses.

¶ 22                            B. Motion for Relief

¶ 23    The defendant filed a motion for relief in both cases on October 21, 2025. He argued that the State failed to prove any of the elements of dangerousness or risk of willful flight. He further

contended that the trial court failed to properly consider his ties to the community, willingness to abide by any terms of pretrial release, employment opportunities, medical issues, lack of criminal history, the fact that no weapon was used in the commission of the alleged offense, and that nobody was injured.

¶ 24 The trial court held a joint hearing on the defendant's motions in both cases on October 23, 2025. Defense counsel reiterated the factors that it raised at the initial hearing and the arguments set forth in the defendant's motion for relief. Defense counsel also argued that the defendant now held a part-time job in addition to his other employment, that he continued to experience considerable pain from his back injury and hernia, and that he was not receiving treatment for his health issues in jail. The defendant still required surgery for the hernia and defense counsel argued that the defendant's health issues prevented him from fleeing the jurisdiction. Defense counsel further stated that the defendant had an alternate location in which he could be on electronic monitoring and home confinement, at the residence of Amanda Latham. Defense counsel noted that Latham had never been convicted of a felony and was present at the hearing to support the defendant. Lastly, defense counsel proffered that, after law enforcement initially called the defendant regarding the burglary, the defendant called both the city police and the sheriff's office and was told that they no longer needed to see him.

¶ 25 The State summarized the evidence it proffered at the previous hearing and maintained its prior arguments. It added that the defendant had demonstrated his lack of credibility regarding the stolen gun and selling drugs, which diminished his credibility as it related to abiding by a pretrial conditions order.

¶ 26 Upon completion of the arguments, the trial court stated that it had not heard anything new at this hearing that it had not already considered at the detention hearing. The trial court

9

acknowledged the defendant's employment, community ties, health issues, and the support from Latham, who was willing to let him stay in her home. However, the trial court balanced this against the "extreme serious[ness]" of the charges and repeated its prior reasoning for why it found the defendant to lack credibility regarding the gun and drug charges. The trial court maintained its finding that the defendant was a flight risk due to the lengthy prison sentences he faced, including a mandatory minimum sentence of 15 years for the gun charge. The trial court further maintained that the defendant posed a danger to the community and to the specific individuals who assisted the police in identifying him. The trial court concluded that there was no condition or combination of conditions that would assure the trial court that the defendant would abide by its orders, particularly where he committed the alleged offenses while under court supervision.

¶ 27    The trial court denied the defendant's motions for relief. The defendant filed a timely notice of appeal pursuant to Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024), which conferred jurisdiction on this court.

¶ 28                                     II. ANALYSIS

¶ 29    Pretrial release is governed by article 110 of the Code, as amended by Public Act 101-652 (eff. Jan. 1, 2023), sometimes referred to as the Pretrial Fairness Act. Under article 110 of the Code, a defendant's pretrial release may only be denied in certain limited situations. See 725 ILCS 5/110-2(a), 110-6.1 (West 2024).

¶ 30    If the State files a petition requesting denial of pretrial release:

"[T]he State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that a defendant has committed a qualifying offense, that the defendant's pretrial release poses a real and present threat to the safety of [another] person or the community or a flight risk, and that less restrictive

10

conditions would not avoid a real and present threat to the safety of any person or the community and/or prevent the defendant's willful flight from prosecution."

*People v. Vingara*, 2023 IL App (5th) 230698, ¶ 7.

See also 725 ILCS 5/110-6.1(e), (f) (West 2024).

Our supreme court has instructed that "[e]vidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 74; see also *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12 ("Clear and convincing evidence is 'that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question.' " (Internal quotation marks omitted.) (quoting *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12))).

¶ 31     The trial court may order a defendant detained pending trial if the defendant is charged with a qualifying offense and the trial court concludes the defendant "poses a real and present threat to the safety of any person" or the community. 725 ILCS 5/110-6.1(a)(1) (West 2024). The statute provides a nonexclusive list of "[f]actors to be considered in making a determination of dangerousness" that the trial court may consider in assessing whether the defendant poses such a threat. *Id.* § 110-6.1(g). These include the nature and circumstances of any offense charged; the defendant's history and characteristics; the identity of any person whose safety the defendant is believed to threaten; and "[a]ny other factors, including those listed in Section 110-5 of this Article deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." *Id.* § 110-6.1(g)(9).

¶ 32     If the trial court finds the State proved a threat to the safety of any person or the community and/or a risk of flight, the trial court must determine which pretrial release conditions, "if any, will reasonably ensure the appearance of a defendant as required or the safety of any other person or

11

the community and the likelihood of compliance by the defendant with all the conditions of pretrial release." *Id*. § 110-5(a). In making this determination, the trial court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; (4) the nature and seriousness of the real and present threat to the safety of any person or the community, based on the specific articulable facts of the case, that would be posed by the defendant's release; and (5) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process. *Id.*

¶ 33    Our standard of review of pretrial release determinations is dependent on whether the trial court heard live witness testimony or whether the parties proceeded solely by proffer or submission of documentary evidence. *People v. Morgan*, 2025 IL 130626, ¶ 21. In the latter case, as here, this court stands in the same position as the trial court and may conduct its own independent review of the proffered evidence, thus reviewing the record *de novo*. *Id.* ¶ 54.

¶ 34    The defendant raises the same arguments in both appeals consolidated here. He contends that the trial court erred in denying pretrial release because the State failed to show that he posed a threat, was at risk for willful flight, or that there were no mitigating conditions available to ensure his compliance with court orders. He does not dispute that the offenses with which he was charged are detainable offenses.

¶ 35    Regarding dangerousness, the defendant notes that the trial court acknowledged that there was no evidence presented that the defendant would hurt anybody and made no individualized assessment of his dangerousness. He alleges that the trial court instead made "generalized findings" that the defendant posed a threat to the witnesses based only on his knowing who they were and that he posed a threat to the community based only on his being charged with armed violence. He adds that the trial court improperly relied on the nature of the offenses to find him

12

dangerous and deny him pretrial release. See *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18 (stating that "the fact that a person is charged with a detainable offense is not enough to order detention, nor is it enough that the defendant poses a threat to public safety," and the trial court must make its determination "based on the specific facts of the case and the defendant's individual background").

¶ 36   Regarding willful flight, the defendant argues that the State's argument and the trial court's reasoning consisted solely of the fact that he faced a very lengthy total sentence if convicted. He contends that this is another improper generalized assumption, rather than individualized findings supported by the facts of the case. Instead, the defendant asserts that the trial court should have considered the specific factors of the defendant's employment, community ties, lack of history of failure to appear in court, and his medical issues.

¶ 37   Lastly, the defendant argues that the State failed to present any evidence that electronic monitoring and home confinement would not ensure his appearance in court, prevent him from committing future crimes, or mitigate any alleged threat he posed. He also points to the defense counsel's statements to the trial court that the defendant was willing to submit to any conditions of pretrial release. He alleges that the State did not contest this.

¶ 38                                    A. Dangerousness

¶ 39   The core of the defendant's argument is that the trial court, in denying pretrial release, relied on generalized assumptions rather than making individualized findings based on the proffered evidence. Regarding dangerousness, the record on appeal contradicts his position. It clearly shows that the trial court considered and balanced the statutory factors required to make its determination that his release posed a danger to individual people and the community.

13

¶ 40    The trial court gave significant weight to the seriousness of all three offenses, as well as the strength of the State's case against the defendant. Regarding the burglary, the State proffered that there was surveillance video footage and one eyewitness identification of the defendant and his vehicle. The State also proffered that Lemons identified the defendant as "Petey." Lemons stated that "Petey" knew Lemons kept a firearm in his house, had visited Lemons on the day of the burglary, and knew that Lemons would not be home that evening. The defendant was later found in possession of the stolen firearm and admitted that it was his, although he did not confess to stealing it from Lemons's home. The defendant was also found in possession of various controlled substances, under circumstances that strongly suggested that he was selling them, despite his statements to the police that the drugs were for his personal use. Upon our independent review of the record, we agree with the trial court's finding that the defendant lacked credibility. The connection of the firearm to the likely drug-dealing further concerned the trial court in finding that the defendant posed a risk to community safety.

¶ 41    In addition to the nature of the offenses, the trial court also considered the defendant's history and characteristics, which it found weighed in his favor when considered on their own. The trial court acknowledged that the defendant was employed and had significant ties to the community, including family ties. He also had no serious prior criminal history or history of harming anyone; however, the trial court noted that the defendant was under court supervision during the alleged offenses and that the court supervision stemmed from the defendant's prior conviction of disorderly conduct. See 725 ILCS 5/110-6.1(g)(8) (West 2024) (court may consider whether, at the time of the offenses or arrest, a defendant was "on probation, parole, aftercare release, mandatory supervised release or other release from custody pending trial, sentencing,

14

appeal, or completion of sentence"); see also *id.* § 110-6.1(g)(2)(A) (court may consider evidence of a defendant's prior criminal history indicative of violence).

¶ 42    Regarding the specific individuals to whom the trial court found that the defendant posed a threat, the trial court did not, as the defendant suggests, merely base its finding on the fact that the defendant was aware of their identities. Rather, the trial court explained that these individuals assisted the police in finding and arresting the defendant and that the defendant was known to possess a firearm and was likely engaging in other dangerous acts like selling drugs. See *id*. § 110-6.1(g)(7) (court may consider whether a defendant "is known to possess or have access to any weapon or weapons"). Furthermore, the sale of drugs has been found to pose a general societal threat, given the harm that can stem from the illicit use of controlled substances. See *People v. Woods*, 2024 IL App (4th) 240190, ¶ 20 ("The societal harm from drug crimes is well-established in Illinois law, meaning the baseline question of whether the sale of drugs is a threat to the community has been answered.").

¶ 43    To summarize, the trial court reviewed the relevant statutory factors and applied the proffered evidence to render its determination that the defendant posed a general danger to the community, as well as a specific danger to Lemons, Schwartz, and Thomas, as well as to Lemons's property. We agree with the trial court's reasoning and find its decision to be proper.

¶ 44                                B. Risk of Willful Flight

¶ 45    We turn next to the trial court's finding that the defendant posed a risk of willful flight. In beginning our *de novo* review of this claim, we first look to the State's verified petitions to deny pretrial release. Neither petition filed by the State alleged that the defendant had a high likelihood of willful flight.

¶ 46    Looking to the plain language of section 110-6.1(d)(1), the Code states as follows:

15

"The petition shall be verified by the State and *shall state the grounds* upon which

it contends the defendant should be denied pretrial release, including the real and

present threat to the safety of any person or persons or the community, based on the

specific articulable facts or flight risk, as appropriate." (Emphasis added.) 725 ILCS

5/110-6.1(d)(1) (West 2024).

Our primary objective when construing a statute is to give effect to the legislature's intent, best

determined by giving the statutory language its plain and ordinary meaning. *People v. Hunt*, 234

Ill. 2d 49, 59 (2009). The word "shall" has been construed as a clear expression of legislative intent

to impose a mandatory obligation. *People v. O'Brien*, 197 Ill. 2d 88, 93 (2001). The language of

the Code thus requires that the verified petition state the grounds upon which the defendant shall

be denied pretrial release.

¶ 47    In the present case, the verified petitions do not allege that the defendant should be denied

pretrial release because he was a flight risk. The petitions only allege the dangerousness standard

as the basis for denial of pretrial release. As such, the trial court erred in considering any factors

related to the detention of the defendant based upon him being a flight risk. Further, the trial court

erred in making any finding that the defendant was a flight risk, as this was not an allegation in the

verified petition, although we recognize that both parties argued whether the defendant should be

considered a flight risk.

¶ 48    Additionally, the present record indicates that the trial court erred in finding the defendant

was a willful flight risk based solely on a potentially lengthy prison sentence. When the State seeks

to deny pretrial release on the basis that a defendant poses a risk of willful flight from prosecution,

the State must establish by clear and convincing evidence (a) that the proof is evident or the

presumption great that the defendant committed a detainable offense, (b) that defendant "has a

16

high likelihood of willful flight to avoid prosecution," if released, and (c) and that no condition or combination of conditions case mitigate the defendant's risk of willful flight. 725 ILCS 5/110-6.1(a)(8), (e)(1)-(3) (West 2024).

¶ 49    The Code defines "willful flight" as

"intentional conduct with purpose to thwart the judicial process to avoid prosecution. Isolated instances of nonappearance in court alone are not evidence of the risk of willful flight. Reoccurrence and patterns of intentional conduct to evade prosecution, along with any affirmative steps to communicate or remedy any such missed court date, may be considered as factors in assessing future intent to evade prosecution." *Id.* § 110-1(f).

When determining whether a defendant may be detained based on a "high likelihood of willful flight to avoid prosecution," the trial court is to consider only "intentional conduct with a purpose to thwart the judicial process to avoid prosecution," as provided in the Code's definition of "willful flight." *Id.* A thwarting of the judicial process generally refers to "a defendant's willful avoidance of prosecution in court by failing to appear at court hearings and similar behaviors." *People v. Quintero*, 2024 IL App (1st) 232129-U, ¶ 22.

¶ 50    In the present case, the trial court contemplated the lengthy sentence the defendant faced if convicted, based on the number and seriousness of the charges, the permissive consecutive sentencing, and the mandatory minimum sentence of 15 years for the gun charge. The trial court acknowledged that the defendant had no serious criminal history or previous failures to appear in court. However, the trial court explained that the high likelihood of convictions on more than one of the charges—and the resulting high possibility of a lengthy total prison sentence—gave the defendant strong motivation to flee the jurisdiction.

17

¶ 51    The Code presumes that pretrial release is available for all criminal defendants. Pretrial release must not, however, be predicated exclusively upon a finding that the defendant committed a detainable offense. 725 ILCS 5/110-6.1(e) (West 2024); *Stock*, 2023 IL App (1st) 231753, ¶ 18. "More is required" than stating the basic elements of a detainable offense, such as its sentencing range. *Stock*, 2023 IL App (1st) 231753, ¶ 18. If the sentencing range for an offense is allowed as the means for detention under the flight risk standard, then every offense with a potentially high sentencing range would be detainable. The trial court's reasoning is clearly at odds with the Code's presumption of eligibility for all defendants, and the plain language of the Code indicates more is required. 725 ILCS 5/110-6.1(e) (West 2024); *People v. Ramirez*, 2023 IL 128123, ¶ 13 ("The best evidence of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning.").

¶ 52    The State did not allege in its petitions that the defendant was a flight risk and did not present any evidence that he intended to thwart the judicial process to avoid prosecution. The trial court recognized the absence of any such evidence but nevertheless found him to be a flight risk. We conclude that the trial court erred when it considered whether the defendant was a willful flight risk, when this ground was not alleged in the petitions to deny pretrial release, and erred when it relied on the sentencing ranges for the felonies charged as a basis for finding that the defendant posed a risk of willful flight if not detained. We thus vacate the trial court's finding that risk of willful flight was a basis for the defendant's detention.

¶ 53                                   C. Mitigating Conditions

¶ 54    Lastly, we disagree with the defendant that the State made no argument and presented no evidence regarding a lack of mitigating conditions. The trial court heard that the defendant was effectively homeless with no fixed address, which would make monitoring his behavior difficult.

18

The pretrial investigation report indicated that pretrial services were unable to investigate the defendant "[d]ue to safety concerns per jail staff." The trial court also noted that, at the time of the burglary and the defendant's arrest, the defendant was on court supervision following his misdemeanor conviction of disorderly conduct and yet he committed three serious felonies within this period.

¶ 55 Furthermore, the trial court considered the specific factors relevant to the mitigating-conditions analysis. See 725 ILCS 5/110-5(a) (West 2024). Without repeating our discussion of the trial court's analysis, we adopt and add the same findings on the issue of mitigating conditions as those discussed above. Those findings concern the nature of the offenses charged and the weight of the evidence against the defendant. They also address the defendant's history and characteristics, as well as the nature and seriousness of the threat he posed to the public in general and to the victim and witnesses specifically.

¶ 56 Thus, we find that the trial court did not err in its determination that there was no condition or combination of conditions that would reasonably ensure the defendant's compliance with court orders and mitigate the risk of danger that he posed. We therefore conclude that the trial court properly granted the State's petitions and denied the defendant's subsequent motions for relief.

¶ 57                                         III. CONCLUSION

¶ 58 Based on the foregoing reasons, we affirm the trial court's orders granting the State's verified petitions to deny pretrial release and denying the defendant's motions for relief based on the dangerousness standard and that no conditions would mitigate the risk posed by the defendant. We vacate the portion of the orders detaining the defendant based on the willful flight standard.

¶ 59 Affirmed in part and vacated in part.

19

| | |
|---|---|
| ***People v. Craig*, 2026 IL App (5th) 250867** | |
| **Decision Under Review:** | Appeal from the Circuit Court of Jefferson County, Nos. 25-CF-208, 25-CF-251; the Hon. Jerry E. Crisel, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Carolyn R. Klarquist, and Eric E. Castañeda, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People. |